IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY,** as subrogee of THE PHILADELPHIA PARKING AUTHORITY | : : : : | **CIVIL ACTION NO.:** 06-cv-05597 |
| v. | : : | |
| **ROBERTS OXYGEN COMPANY, INC.** and **INERGY PROPANE, LLC,** doing business as **DIRECT PROPANE** | : : : : | |
| v. | : : | |
| **O'DONNELL & NACCARATO, INC.** | : : | |

<u>**PLAINTIFF'S TRIAL BRIEF**</u>

**I.     NATURE OF THE ACTION**

This is a civil case seeking monetary damage totaling $969,816.78. The plaintiff, Federal Insurance Company, brought this lawsuit as a result of payments it made to its insured, The Philadelphia Parking Authority, because of a propane explosion and fire that occurred on January 22, 2005. The plaintiff has asserted claims in negligence, strict liability and breach of warranty. Jurisdiction in this matter is based upon diversity between the parties.

**II.    STATEMENT OF FACTS**

The plaintiff, Federal Insurance Company, is an insurance company which is authorized to issue policies of insurance in the Commonwealth of Pennsylvania. Federal Insurance Company issued an insurance policy to its insured, The Philadelphia Parking Authority, which was a tenant in a building located at 3101 Market Street, Philadelphia, Pennsylvania.

In connection with its tenancy, the Philadelphia Parking Authority engaged various design professionals, construction managers and contractors to perform renovations to its leased

space. In order to provide temporary heat to the renovated space, the design and construction entities involved in the renovation project made arrangements with defendant Roberts Oxygen Company to supply filled 100 pound propane cylinders for use in connection with two propane heaters at the leased location.

The propane cylinders delivered by Roberts prior to January 22, 2005 included a cylinder identified with markings that read: "5346357", "11-87", and "Property of Roberts Oxygen Co., Rockville, Maryland" (hereinafter referred to as the "the propane cylinder"). On January 22, 2005, the propane cylinder leaked propane which was ignited by an ignition source within the Philadelphia Parking Authority leased space. The flames and heat that were generated as a result of the ignition of the propane leaking from the propane cylinder attacked and impinged upon the propane cylinder which caused it to explode and be propelled through the leased space, showering the leased space with propane liquid, gas and vapors.

The fire, heat and explosion of propane from the propane cylinder caused significant damage and destruction to the property of the Philadelphia Parking Authority, caused the Philadelphia Parking Authority to incur extra expenses to restore its business and operation and led to a loss of income and business by the Philadelphia Parking Authority. As a result of the damages caused by the fire, the Philadelphia Parking Authority submitted claims to the plaintiff for indemnity and reimbursement under its insurance policy.

The propane cylinder was owned by and the property of Roberts at the time it was delivered to the Philadelphia Parking Authority leasehold space and at the time of the fire and explosion. The propane cylinder was first put into service in 1987 and certified as being appropriate for use under the appropriate state and federal regulations at that time. Prior to January 22, 2005 the propane cylinder had not been recertified or re-qualified. The propane cylinder was filled and charged by defendants Roberts and Inergy Propane, but at no time prior

to January 22, 2005 did either of the defendants recertify or re-qualify the propane cylinder as required under applicable federal and state rules, regulations, laws, standards and practices. The fire and explosion was caused by the propane leaking from the propane cylinder as a result of the rusted, deteriorated, corroded and defective condition of the propane cylinder, all in violation of applicable state and federal rules, regulations, laws, standards and practices.

The defendants continually reused, refilled, recharged and transported the propane cylinder without proper recertification, re-qualification, testing, analysis and evaluation, on an ongoing basis for more than five years prior to January 22, 2005. The propane cylinder and the propane within it were sold, supplied, delivered, assembled and provided to the Philadelphia Parking Authority in a defective condition, unreasonably dangerous to users and consumers of the propane cylinder and the propane within it. Each of the defendants are sellers, merchants, suppliers and assemblers of the propane cylinder and propane gas which, as a unit, are placed into the stream of commerce for use by consumers such as the Philadelphia Parking Authority.

### III.   LAW AND ARGUMENTS

      A.   **DEFENDANT ROBERTS OXYGEN COMPANY MAY BE HELD STRICTLY LIABLE FOR DEFECTS EXISTING WITHIN THE SUBJECT PROPANE CYLINDER**

Pennsylvania has adopted § 402A of the Restatement (Second) of Torts. <u>Balczon v. Machinery Wholesalers Corp.</u>, 993 F.Supp. 900 (W.D.Pa. 1998). It provides that:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A (1965).

"Pennsylvania courts have extended the term 'seller' to include anyone who markets a product by sale, lease or bailment." Balczon, 993 F.Supp. at 903. "A 'seller' includes '[a]ll suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors or any other relevant category." Id. at 903-904, quoting Malloy v. Doty Conveyor, 820 F.Supp. 217, 220 (E.D.Pa. 1993), citing Burch v. Sears, Roebuck & Co., 320 Pa. Super. 444, 467 A.2d 615, 621 (1983). Thus, Roberts may be held strictly liable in this case even though it did not manufacture the subject propane cylinder and/or retained title to the cylinder.

It is widely recognized that "the containers in which products are sold are so closely identified with the sale of the product that the container's dangerous propensities are the equivalent of the dangerous propensities of the product itself." See Weyerhaeuser Company v. Thermogas Company, 620 N.W.2d 819 (Iowa 2000) quoting Fulbright v. Klamath Gas Co., 553 P.2d 316, 320 (Or. 1975). In Weyerhaeuser Company v. Thermogas Company, the Supreme Court of Iowa assessed whether a propane supplier, like Roberts, could be held strictly liable for a defect existing within a propane tank filled and supplied by Thermogas. Like Roberts, Thermogas filled and supplied the plaintiff, Weyerhaeuser, with propane tanks for Weyerhaeuser's use at its cardboard box manufacturing plant. The tanks were used to fuel clamp trucks. One day, a fire developed within a clamp truck and eventually spread to the propane tank located on the back of the truck. The propane tank exploded and spread fire throughout the plant.

Weyerhaeuser sued Thermogas in negligence, strict liability and breach of warranty alleging that the tank was defective and should not have exploded. Like here, the tank in

Weyerhaeuser was overdue on its mandatory recertification testing and there was evidence that the tank was either corroded or damaged.

At trial, Thermogas argued that it was excepted from Iowa's product liability statute and could not be held strictly liable. The trial court agreed and directed a verdict in Thermogas's favor on plaintiff's strict liability count. On appeal, the Supreme Court of Iowa reversed the trial court's decision. Reviewing applicable authorities, the Court held that Thermogas was an "assembler" and, therefore, not excepted from the statute. Moreover, the Court adopted the widely held view that where a product's container is itself dangerous, the product is sold in a defective condition. Comment h to Section 402A of the Restatement (Second) of Torts states:

> The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from the way in which the product is prepared or packed. No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. **Where the container is itself dangerous, the product is sold in a defective condition**. . . .

Restatement (Second) of Torts § 402A cmt. h (emphasis added).

Applying that logic, the Court in Weyerheuser held "[t]he container – the tank – cannot logically be separated from its contents – the liquid propane – when the two are placed in the stream of commerce as a unit. The finished product was the LP tank filled with liquid propane, which Thermogas placed into the stream of commerce. Thermogas combined a defective component part – its tank – with its liquid propane." See Weyerhaeuser, 620 N.W.2d at 827. Likewise, in Assam v. Deer Park Spring Water, Inc., 63 F.R.D. 400 (E.D.N.Y. 1995), the District Court held that Deer Park could be held strictly liable for defects existing within the bottles its filled with water and supplied to its customers, even though Deer Park did not manufacture the bottles and retained title to the bottles at all times.

Thus, it is of no moment that Roberts Oxygen did not manufacture the propane cylinder. Roberts may nonetheless be held strictly liable for supplying a defective and dangerous propane cylinder to PPA's leasehold.

**B.   DEFENDANTS' ALLEGED VIOLATIONS OF FEDERAL STATUTES AND INDUSTRY REGULATIONS AND STANDARDS ARE ADMISSIBLE TO PROVE NEGLIGENCE.**

Title 49 CFR Sections 173, 178 and 180 set forth certain regulations with which the defendants were legally required to comply. In addition, the National Propane Gas Association (NPGA) and National Fire Protection Association (NFPA) have promulgated standards that are regularly followed in the industry and have been adopted by code in Pennsylvania. Evidence of defendants' failure to comply with any and all applicable codes, regulations and standards is admissible to prove their alleged negligence.

It is well established that under Pennsylvania law, the violation of a governmental safety regulation constitutes negligence per se. "Pennsylvania law views a statutory violation as conclusive evidence of negligence, in the absence of an excuse for that violation. . . ." In re Orthopedic Bone Screw Products, 193 F.3d 781 (3d Cir. 1999), quoting Stanton By Brooks v. Astra Pharmaceutical Products, 718 F.2d 553 (3d Cir. 1983). Where a defendant has violated a relevant statute or regulation, courts have held as a matter of law that plaintiffs have satisfied the first two elements of their cause of action for negligence: duty and breach of duty. See In re TMI, 67 F.3d 1103, 1118 (3d Cir. 1995). Here, plaintiff's experts will testify about the numerous statutes, codes and regulations governing defendants' conduct and defendants' failure to comply with such statutes, codes and regulations. Such evidence is admissible to prove the defendants' negligence in this case.

      **C.**      **DEFENDANTS MUST BE PRECLUDED FROM MAKING ARGUMENTS TO THE JURY, OFFERING ANY TESTIMONY (BY WAY OF DIRECT OR CROSS EXAMINATION) OR UTILIZING ANY EXHIBITS WITH RESPECT TO THE FOLLOWING SUBJECT MATTERS.**

      **1.**      <u>**Alleged Violations of Fire Code:**</u>

The defendants may attempt to argue that the propane cylinders stored at the construction site violated the City of Philadelphia Fire Code. However, the code that was identified in a Violation Notice sent to the building owner after the fire was based upon the lack of a license issued by the City and approval by the City Fire Department for the storage of propane. The section in question applies to the permanent installations of propane cylinders, not the use of propane heating systems for temporary heat or buildings under construction.

The defendants have not identified any witness from the City of Philadelphia who can offer first-hand knowledge of the alleged violations, including the inspector who issued the violation reports. There is no foundation for the evidence and no testimony related to the factual basis for any alleged violations. As such, any evidence with respect to these violations issued by the City constitutes inadmissible hearsay.

Further, the defendants have offered no evidence, by way of expert witness or otherwise, to establish any "causation" between the alleged violations of the fire codes and the explosion, such as any enhanced damages sustained by the plaintiff. The City of Philadelphia fire code relied upon by the defendants would permit two separate 100-pound cylinders to be located within the building. The only evidence in this case is that a single 100-pound cylinder exploded, leading to the fire and subsequent destruction and damage in the building. There is no evidence that any additional cylinders stored in the facility exploded, caught fire or otherwise

created any damage in the renovated space. As such, there is no link or causation between any alleged violation and any relevant issue in this case.

Finally, the defendants have failed to establish that a license or permit for the use of propane cylinders for temporary heating purposes would not have been issued by the City of Philadelphia or approved by the fire department, if sought before the fire.

For these reasons, the defendants should be precluded from utilizing any alleged fire code violations as evidence in this matter.

### 2. The Expert Opinions of Capital Construction Consultants and Parente Randolph:

Defendants Inergy and Roberts Oxygen have offered the alleged expert opinions of Capital Construction Consultants and Parente Randolph, respectively, on the issue of damages in this case. The March 16, 2007 report issued by Mr. Robert M. Lockhart of Capital Construction and the August 23, 2007 report of Glenn Newman of Parente Randolph with respect to those damages are nothing more than a recitation of questions, summary of issues, and citations to a lack of information, none of which adds to a jury's understanding of the issues in the case.

Mr. Lockhart's opinions are vague and indefinite. He has not provided any solid or reliable opinions with respect to the value of the damages claimed by the plaintiff. In fact, he states that the information he reviewed and the work scope involved "is not defined sufficiently to allow a proper forensic analysis". He notes that "the lack of complete detailed documentation of the claim prevents processing this claim". (See Lockhart Report. p. 4 – "Executive Summary," attached as Exhibit "A"). He then concludes that the "proper establishment of a true value for any loss [is] impossible to determine". Yet, despite these acknowledgements, Mr. Lockhard speculates that approximately $500,000 of the damages claimed by the plaintiff should

be disallowed.  This is nothing more than a guess on his part, without any basis in fact or analysis.

Likewise, Mr. Newman's report does not contain solid or reliable opinions that are admissible.  Most of Mr. Newman's report focuses on matters that are outside the scope of expert testimony and invade the purview of the jury.  For example, Mr. Newman spends much time discussing whether plaintiff has proven causation and/or has mitigated its damages.  (See Newman Report, pp. 4-5, attached as Exhibit "B").  Whether plaintiff can causally relate its damages to the fire and explosion or whether it has mitigated its damages are issues for the jury to decide, not Mr. Newman.  What's more, Mr. Newman himself acknowledges that he cannot estimate plaintiff's damages to a reasonable degree of certainty, and, therefore, he has no opinions to offer that would be helpful to the jury.  On page 5 of his report, Mr. Newman states that "because significant information and documentation is lacking, an alternative estimation of loss can not be established to a reasonable degree of professional certainty at this time."   (See Newman Report, p. 5.)  Ultimately, the only conclusion he reaches about plaintiff's damages is that the "actual damages suffered appear to be less than those offered by the Plaintiff."  Such vague, unsubstantiated "opinions" will not assist the jury and are inadmissible.

Because neither Mr. Lockhart's nor Mr. Newman's testimony will assist the jury in this matter, their opinions and conclusions should be precluded.

                                        COZEN O'CONNOR

                                   BY:  _/s/Paul R. Bartolacci_____
                                      Paul R. Bartolacci, Esquire
                                      1900 Market Street
                                      Philadelphia, PA  19103
                                      Phone: (215) 665-2001
                                      Fax:    (215) 701-2001
                                      Email: pbartolacci@cozen.com

## CERTIFICATE OF SERVICE

      Paul R. Bartolacci does hereby state that on this 4th day of September, 2007, a true and correct copy of Plaintiff's Trial Brief electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

James M. Prahler, Esquire
Margolis Edelstein
The Curtis Center, Fourth Floor
Independence Square West
Philadelphia, PA  19106-3304


Thomas H. Davis, Esquire
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2400
Kansas City, MO  64106-2150


Andrew J. Connolly, Esquire
Post & Schell
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103

                                                             /s/  Paul R. Bartolacci
                                                        Paul R. Bartolacci, Esquire