# *EXHIBIT A*

# Preliminary Report Regarding Costs Claimed as Resulting from a 22 January 2005 Incident

Prepared by:

## Capital Construction Consultants, Inc.

Prepared for:

## Stinson Morrison Hecker LLP

On behalf of:

## Inergy Propane, LLC

In regard to:

## Federal Insurance Company a/s/o Philadelphia Parking Authority v. Roberts Oxygen, Inc. and Inergy Propane, LLC d/b/a Direct Propane

March 16, 2007

_____
Robert M. Lockhart, Exec. VP

CAPITAL
CONSTRUCTION
CONSULTANTS,
INC.

1120 Connecticut Ave. NW, Suite 1210, Washington, DC 20036

# Table of Contents

1   Assignment..................................................................3

2   Executive Summary.....................................................4

3   Overview ....................................................................5

4   PPA Costs Claimed.....................................................6

    A  Building and Improvements ...$762,933 claimed................6

    B  Personal Property Losses ...$59,230 claimed...................10

    C  Professional Fees (limit) ...$10,000 claimed     no comment

    D  PPA Emergency and Cleanup Labor ...$75,000 claimed.....11

    E  Emergency Services ...$24,653.78 claimed ....................11

    F  Business Interruption ...$114,086 claimed......................11

5   API Costs Claimed... $368,724.30 claimed....................12

6   Conclusion................................................................14

    Curriculum Vitae of Robert M. Lockhart.............15

# 1 Assignment

This firm was tasked by the firm of Stinson Morrison Hecker LLP to review the reasonableness of costs claimed by the Philadelphia Parking Authority (**PPA**) and Academic Properties, Inc. (**API**) as they relate to claimed damages resulting from an explosion and fire that occurred on 22 January 2005. The report does not attempt to establish responsibility for any losses or comment on any interpretation of the law. We anticipate forming additional opinions as additional information is provided.

This assignment was given to Robert M. Lockhart, whose CV is contained herein. The opinions included herein are based on the information provided and the over thirty years of construction experience Mr. Lockhart has acquired.

## 2     Executive Summary

There are two basic ways to establish the reasonableness of costs. In one method the work is competitively bid between competent contractors in the business and the low bidder would establish the benchmark. The other method is to compare costs with historical costs and adjusting the price to account for project specific variables. Other methods usually combine different aspects of the two basic methods above, such as bidding on hourly rates and fee percentages but leaving the scope to be established at a later date.

The information provided in the claims indicates neither an attempt at bidding the work nor fixed percentages for overhead and profit was made. Further, the scope of the work is not defined sufficiently to allow a proper forensic analysis.

From the information provided there is considerable evidence that insufficient oversight was provided in the expenditures expensed by PPA and now being presented as a claim. This evidence includes excessive double payments for Variable Air Volume (VAV) dampers, inclusion of Sales Tax although documents indicate that the work is "tax exempt", excessive labor charges and costs for work not related to the incident. The lack of complete detailed documentation of the claim prevents processing this claim.

The PPA claim for losses associated with reduced sales of Smart Cards equates a sale of a Smart Card as 100% profit with no corresponding expense or liability. That claim has no merit as presented.

The API claim is generally straightforward and shows a distinct contrast with the PPA proposal. The API proposal includes only costs expended that they would not have expended were it not for the explosion and fire. The only issues relate to some possible overpricing by their subcontractors without the subcontractors trying to bury contract work from other obligations in billings to the insurance claim.

## 3    Overview

On 22 January 2005 an explosion and fire occurred in the area leased by the Philadelphia Parking Authority at 3101 Market Street, Philadelphia, PA, resulting in damage to the structure and a fire that was soon extinguished. Upon examination the next day a determination was made by the City of Philadelphia that the Philadelphia Parking Authority (**PPA**) was performing construction work without the Building Permits required by Law and they issued Violation Notices (API 0722-0725) against Academic Properties, Inc. (**API**) due to the failure of PPA to obtain the permits they had agreed to obtain in accordance with Exhibit E, paragraph B(3) of their Lease.

At the time the construction was well underway with most of the metal wall framing installed and a majority of the ductwork installed.

The claim presented by PPA is generally all of the work within the shell of their rented space. The claim by API, as the owner of the building, is generally all of the structure and common areas.

In the agreement between API, as the Landlord, and PPA, as the tenant, (per Exhibit F of the Lease, Bates #PPA00515):

> *"Tenant shall not do anything in the rooms, or bring or keep anything therein, which will in any way increase or tend to increase the risk of fire or the rate of fire insurance, or which will conflict with the regulations of the Fire department or the fire laws, or with any insurance policy on the Building or any part thereof, or with any law, ordinance, rule or regulation affecting the occupancy and use of the rooms, now existing or hereafter enacted or promulgated by any public authority or by the Board of Fire Underwriters."*

Both API and PPA are claiming damages from the defendants but ignoring any culpability on their part. However, since this report addresses just the quantum of the claim and not the merit, no further review of the merit is made.

## 4    PPA Costs Claimed

### A  Building and Improvements – $762,933 claimed

1. Highly Questionable – examples

    a) PPA had a contract with Wilgro Services Inc. (Wilgro) to pay $184,000 for Heating, Ventilation and Air Conditioning (**HVAC**) renovation work prior to the explosion and fire as documented by Bates # PPA00227-00228. As of 31 Dec. 2004 (23 days prior to the explosion/fire) the full $14,200 of VAV and control material was delivered and the $32,200 installation activity for this work was 68%, complete as shown on Schedule G703 (PPA00228). The documentation for the next payment to Wilgro is the only payment for which the G703 schedule was not included within the claim book. Therefore the most essential document of the status of the work is missing.

    PPA includes in their claim $154,000 for Wilgro to bring the HVAC back to the condition it was prior to the explosion. This amount includes $28,500 for VAV and $7,500 for controls. Therefore PPA agreed to pay $36,000 for VAV and controls originally purchased for $14,200.

    PPA goes on to issue a change order to Wilgro in the amount of $23,026 (Bates # PPA00170-00172) which includes $21,901 for these same VAV boxes. The PPA claim now includes $57,901 for VAV boxes and controls originally purchased for $14,200.

    Wilgro 25 Jan. 2006 letter (Bates # PPA00901) gives reasons for higher costs to include additional VAVs and new VAV locations, neither of which would be related to the explosion or fire.

    b) The PPA claim includes $7,339 for sales tax. Throughout the documentation there are notes indicating that the project is exempt

from sales tax. If sales tax was required, PPA must produce proof that they have paid same.

c) The PPA claim includes $1,352.65 to remove insulation and install heat trace (bates #PPA00073) on 28 Jan. 2005 only to spend the next two days removing the work just installed (Bates #PPA00075).

d) The PPA claim includes $154,000 to "take the project from where it was immediately after the explosion and fire to where it was immediately prior to the explosion and fire" (Bates # PPA00157) but fails to take into account that all of the prior HVAC work was performed without the permits as documented by Bates # API 0723. In accordance with Exhibit E, paragraph B (3) of the Lease, PPA agreed that "...all necessary permits are to be secured and posted by Tenant's contractors". Accordingly no credit for reworking ductwork necessary for inspection has been included.

2   High Prices -- examples

a) Belfor was brought in immediately after the explosion/fire to perform emergency work to close in the building. Belfor was paid a premium price of $42/hr for a carpenter, plus Belfor's overhead and profit to bring the total cost to $50.82 per carpenter hour. It is understandable that a premium for a quick response may be necessary but the $70.46 per carpenter charged by Mega for general carpentry work, months after the event, is excessive.

b) There is no indication that Wilgro ever performed the duct cleaning required of their contract as documented by Bates # PPA00228. They had a value of $3,500 to perform the duct cleaning. PPA however paid Voegele $13,350 for the performance of this work (Bates # PPA00860) and includes this entire amount in his claim along with $1,800 to perform an inspection of the ductwork. The report prepared by Voegele (Bates #PPA00864) documents that there was

no damage resulting from the explosion or fire relevant to this work. Accordingly these costs should be removed from the claim.

3. Insufficient Documentation to indicate work related to fire/explosion – examples

   a) PPA claim includes a Diversified Electrical invoice #12144 to troubleshoot why an exit light and sign were not working on 4/29/05. There is no subsequent report from electrician indicating the explosion/fire more than three months prior was the cause.

   b) PPA claim includes Diversified Electrical invoices #12131, 12132, 12135 and 12136 to perform additional electrical work in May 2005. There is no indication that this work was required due to the explosion/fire more than three months prior.

   c) Material documentation to Diversified Inv. # 12136 is missing.

   d) All invoices must indicate the scope of the damaged work that is being repaired. If no justification of how the work relates to the fire/explosion is provided, the claim lacks the documentation necessary to process the claim.

   e) O'Donnell Niccarato was the Architect for the project. The claim includes $58,092.44 for their services prior to March 2005 for which documentation is not included within their claim.

   f) Wicks Fisher White was employed to provide engineering services. Copies of any reports or drawings generated by this firm should be provided to better understand the work performed. Similarly, any drawings, sketches or letters issued by O'Donnell Niccarato should be provided for the same reason.

4  Insufficient Documentation to indicate value of work -- examples

   a) Need full scope of $92,893 claimed electrical work as well as copy of exhibit price schedule referenced on Bates # PPA00060.

   b) Need full scope of $58,048 claimed demolition work and the basis for accepting that value.

   c) Need full scope of $150,944 claimed for "DW, Paint, Tile, Carp., Doors and Masonry" and the basis for accepting that value. In the event any drywall work was placed an adjustment will be necessary since removal would be necessitated to comply with the inspection requirements of the building permit.

   d) Need full scope of $3,500 claimed for plumbing and the basis for accepting that value. Possible duplication with plumbing charged elsewhere.

   e) Material documentation to Diversified Inv. # 12136 is missing.

   f) All invoices must indicate the scope of the damaged work that is being repaired. If no quantities of work are provided the claim lacks the documentation necessary to process the claim.

   g) Bates # PPA00109 is illegible.

**B**   **Personal Property Losses – $59,230 claimed**

1. Most prices are unsubstantiated but are generally within range of reasonableness. The few exceptions that require further review follows:

   a. Computer - $3,200 – picture referenced in Bates # PPA00339 has not been provided.

   b. Tools - $2,687 – It is hard to believe that all of this brand new equipment was destroyed by the explosion/fire. Records are not clear as to if tools were lost and the explosion/fire was blamed or the blast was so intense that it destroyed all of the drill bits. PPA has failed to present the facts documenting this loss such as a copy of the invoice or check paying this claim. If the tools were used, PPA should have established a factor to establish their value at the time of the explosion/fire? If the tools were new, a copy of the sales receipt should have been provided.

   c. Carpet and Vinyl Floor cleaning - $18,150 – since the claim includes new carpet it is essential that the cost of cleaning carpet and vinyl that would have required cleaning anyway, due to the construction that was not related to the explosion/fire, be credited or an explanation provided as to why that portion of the clean up would be the responsibility under the insurance claim.

### D    PPA Emergency and Cleanup Labor – $75,000 claimed

The explanation of the logic behind the math used to establish the $75,000 value is necessary prior to an evaluation of this claim. Actual payroll records, timesheets and documentation of fringe amounts should have been provided to support this claim. If the personnel are salaried personnel, it is necessary that documentation be provided documenting the costs incurred beyond the salary.

### E    Emergency Services - $24,654 claimed

The invoice from Belfor is high but is reasonable as an emergency service when there are insufficient hours to obtain competitive pricing.

### F    Business Interruption – $114,086 claimed

The argument advanced by PPA seems to be based on the presumption that Smart Cards are used solely by individuals who would not park at parking meters unless they had a smart card. In fact Bates # PPA00305 states "Also attached are reports that establish there was no drop in revenue in coin sales relative to the explosion, in fact, the coin sales have remained consistent with previous months." The following page (PPA00306) in fact shows a $68,029 drop in sales in the first quarter of 2005 from the first quarter of 2004. In coin sales there is no lag in time between the receipt of money and the use of the meter. The Smart Card by necessity creates a situation where the $10 or $20 smart card is used up in the following months. The analysis provided by PPA is deficient because it fails to provide useful information to support this claim. If PPA wishes to pursue this issue an analysis must include the last 5 years to account for seasonal variations and document both cash and amount of Smart Card usage.

# 5 API Costs Claimed

The API claimed costs total $368,724.30. Generally these costs are more in line with what is expected, but here are several issues to be addressed as follows:

a) Palmer, Inc. (API 0019) indicates a brick material required to cover 800 square feet would cost $16,700. This equates to over $20 per square foot for the brick material. Since the other material and labor are accounted for elsewhere the specific brick type and size is needed. This is either a very expensive brick or the amount paid was excessive. Similar concerns for the other brick and the block.

b) Palmer, Inc. (API 0019) indicates that Palmer obtained a permit. What type of permit was obtained?

c) Palmer, Inc. (API 0020) indicates labor for masonry work that is excessive if quantities indicated on the previous page define the scope of the work.

d) Palmer, Inc. (API 0020) indicates a price of $7,300 to remove 50 feet of siding and replace with new material. The next activity indicates $22,500 to remove and reinstall 100 feet of siding. Apparently there would have been a savings if only new material was used. The prices are excessive or insufficient documentation has been provided to document this claim.

e) To understand the API 0027 Allied Barton Securities value an explanation should be provided as to 1) the date Mr. Dennis Sigmund worked seven hours overtime and 2) how an overtime premium of $22.37 is established when a flat rate of $9.00 to $11.00 is indicated?

f) Kay & Sons (API 0070) explains that there is a minimum order of 11,677 square feet for the discontinued material that was chosen even though only 7,000 square feet of material is to be installed. The pricing however seems to indicate that he has included adhesive and labor for the full 11,677 square feet of material.

g) API 0074 should indicate the quantity of material so that a reasonableness check can be made regarding the proposal provided.

h) The J Cornell invoicing seems aggressive and any daily reports generated at the site indicating the quantity of personnel should establish if the proposal is unreasonable. Apparently the extent of the work is indicated on a "Keast and Hood" sketch that has not been reviewed. It is unusual for temporary roof protection removal (API 0061) to cost more than temporary roof protection installation (API 0047).

## 6     Conclusion

A substantial portion of the losses claimed by API and PPA have not been sufficiently documented and/or verified. In many cases the evidence provided by PPA proves that much of their claim is without merit. API and PPA must fully document the true value of their losses. Adjustments must be made as noted above.

The API claim is close to proper establishment of a true value of the losses incurred. An adjustment without allowing them the opportunity to resolve the outstanding issues would not be proper.

The PPA claim is far from establishing the true value of the losses incurred, is excessive and their providing of additional documentation reveals more problems with their claim than resolution of their claim. PPA's failure to provide proper documentation of their losses makes the proper establishment of a true value for any loss impossible to determine. Based upon the information reviewed, as described above, approximately $500,000 of the PPA claimed losses should be disallowed.